Drexelbrook Associates, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued March 22, 1965. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Irving R. Segal,* with him *Guy G. deFuria, Harold B. Bornemann,* and *deFuria, Larkin & deFuria,* and *Schnader, Harrison, Segal & Lewis,* for appellant.

432

*Daniel F. Joella,* Assistant Counsel, with him *Joseph C. Bruno,* Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

OPINION BY MR. JUSTICE ROBERTS, June 30, 1965:

Applications to the Public Utility Commission were filed by the Philadelphia Electric Company and the Philadelphia Suburban Water Company seeking approval of the transfer by sale of certain equipment.[1] Commission approval would enable the applicants to transfer distribution, service-supply and metering equipment to Drexelbrook Associates, a registered limited partnership which owns and manages a real estate development known as "Drexelbrook". Drexelbrook, located in Drexel Hill, Delaware County, is a garden-type apartment village with 90 buildings, containing 1223 residential units, 9 retail stores, various public areas, and a club with a dining room, swimming pool, skating rink, and tennis courts.

The equipment involved in the proposed transfer was installed originally by the applicants in the buildings and stores of the development and is presently used by the applicants to furnish gas, water and electric service directly to Drexelbrook tenants. Upon conclusion of the transfers, water service would be supplied by the water company directly to Drexelbrook Associates at four metering points and gas and electric service would be supplied by the electric company to Drexelbrook Associates at a single metering location.[2] Drexelbrook Associates would purchase gas, electricity,

---

[1] The approval was sought under §202(e) of the Public Utility Law, Act of May 28, 1937, P. L. 1053, 66 P.S. §1122(e), as amended by Act of August 24, 1963, P. L. 1225, §2, 66 P.S. §1122 (Supp. 1964).

[2] Presently, water service is supplied at 106 metering points, electric service is supplied at 1335 metering locations, and gas service is supplied at 1283 existing locations.

and water from the applicants at the proposed metering points. In turn, it would assume the obligation and sole responsibility for furnishing and distributing gas, electricity, and water to its tenants and for servicing and maintaining the transferred facilities.

With respect to electricity and gas, Drexelbrook Associates assumes that it would qualify for wholesale tariff rates at such single metering points,[3] and proposes to retain the transferred meters in order to measure each of its tenant's individual consumption. It has agreed to bill each tenant on the basis of such consumption at the same rate which the tenant would pay if he received service individually and directly from the electric company, thereby enabling it to make a profit. In like manner, Drexelbrook Associates assumes that, with respect to water, it would also qualify for the applicable wholesale tariff rates based on single point water metering service.[4] It proposes to continue to furnish water to apartment tenants on the existing basis by including the charges for water services within the rent. Evidently, remetering of water at a profit is contemplated only with respect to the swim club and store tenants.

The commission dismissed the applications without hearing on August 19, 1963. Drexelbrook Associates then asked the commission to reopen the matter and to grant it leave to intervene and offer evidence in support of the applications. The request was granted but after a subsequent hearing the commission, by a vote

---

[3] Although the commission itself seems to have assumed previously that Drexelbrook would qualify for the wholesale rates, it now questions for the first time in its brief before this Court whether Drexelbrook is so qualified. Even assuming the relevance of this factor in the present proceeding, we will not now indulge in a fact finding process which the commission itself did not see fit to undertake.

[4] See note 3, supra.

of 3-2, dismissed the applications on June 8, 1964. Thereafter, Drexelbrook Associates appealed to the Superior Court[5] which divided equally, thereby affirming the commission's order. A majority of the Superior Court then certified the case to this Court for consideration and decision.[6]

In dismissing the applications, the commission held that upon consummation of the proposed transfers of the designated service and metering equipment, appellant would become subject to the provisions of the Public Utility Law.[7] For that reason, the commission concluded that it would be necessary for appellant to seek commission authorization to furnish the public utility services now rendered by the applicants.

The term "public utility" is defined in Section 2 of the Public Utility Law as including "persons or corporations . . . owning or operating in this Commonwealth equipment or facilities for: (a) producing, generating, transmitting, distributing, or furnishing natural or artificial gas, electricity . . . *to or for the public* for compensation; (b) diverting, developing, pumping, impounding, distributing or furnishing water *to or for the public* for compensation. . . ."[8] (Emphasis supplied.) The question presented is whether the service which appellant proposes to furnish to its tenants would be service *to or for the public* within the meaning of the statute.

A number of decisions prove helpful in deciding the question in this case. In *Borough of Ambridge v. P.S.C.*,

---

[5] Neither the Philadelphia Electric Co. nor the Philadelphia Suburban Water Co., applicants before the commission, took an appeal from the commission's determination.

[6] See Act of June 24, 1895, P. L. 212, §10, 17 P.S. §197.

[7] Act of May 28, 1937, P. L. 1053, §1 et seq., as amended, 66 P.S. §1101 et seq.

[8] Act of May 28, 1937, P. L. 1053, §2(17)(a) and (b), 66 P.S. §1102(17)(a) and (b).

108 Pa. Superior Ct. 298, 165 Atl. 47 (1933), allocatur denied, 108 Pa. Superior Ct. xxiii, where a manufacturer who furnished water to another manufacturer was held not to be rendering a public service, the court said that " 'the public or private character of the enterprise does not depend . . . upon the number of persons by whom it is used, but upon whether or not it is open to the use and service *of all members of the public* who may require it . . . .' " (Emphasis supplied.) 108 Pa. Superior Ct. at 304, 165 Atl. at 49. *Aronimink Transp. Co. v. P.S.C.*, 111 Pa. Superior Ct. 414, 170 Atl. 375 (1934), was a case where a corporation operated apartment houses and furnished bus transportation to its tenants. Because the corporation served only those who were selected as tenants—a special class of persons not open to the indefinite public—the court held the service to be private in nature.[9] The court concluded that the service rendered was merely incidental to the business of maintaining the apartment house, and the fact that the transportation was furnished to hundreds of individuals residing in the 288 apartments did not transform the private nature of the service into a "public service".

*Overlook Dev. Co. v. P.S.C.*, 101 Pa. Superior Ct. 217, aff'd per curiam, 306 Pa. 43, 158 Atl. 869 (1932), involved a land development company which distributed water not only to vendees situated on its previously owned tract of land, but also to owners of adjacent land. The court held the service was not open to the indefinite public but, being confined to privileged individuals, was private in nature. Significantly, the commission itself, in *Camp Wohelo, Inc. v. Novitiate of St. Isaac Jogues*, 36 Pa. P.U.C. 377 (1958), adhered to the doctrine expressed in *Overlook*, stating that " 'a public

---

[9] The court cited with approval the quotation from *Borough of Ambridge*, supra, in text.

use . . . is not confined to privileged individuals, but is open to the indefinite public' " and that " 'it is this indefinite or unrestricted quality that gives it its public character.' "

Although the present case involves the owner of an apartment complex which proposes to render service to its tenants and to no one else, the commission held that the contemplated service would not be merely incidental to the operation of Drexelbrook, but would be a separate and distinct enterprise for profit, subject to the Public Utility Law. In part, the commission based its conclusion on the fact that appellant does not propose to reserve the right to select its customers, but would obligate itself under separate and uniform contracts to furnish service to all tenants, present and future, in its development. The fallacy of this reasoning is shown in the dissenting opinion of the commission chairman which stated that the test "is not whether all tenants are being furnished service, but whether anybody among the public outside of the Drexelbrook group is privileged to demand service."[10] In the present case the only persons who would be entitled to and who would receive service are those who have entered into or will enter into a landlord-tenant relationship with appellant. Here, as in *Aronimink,* those to be serviced consist only of a special class of persons— those to be selected as tenants—and not a class open to the indefinite public. Such persons clearly constitute a defined, privileged and limited group and the proposed service to them would be private in nature.[11]

---

[10] 41 Pa. P.U.C. at 515.

[11] The record shows many instances where landlords and owners of large apartments and office buildings purchase utility service on a wholesale basis and furnish such service to their office and apartment tenants. Included among these are the Presidential Apartments, Rittenhouse Claridge, Rittenhouse Savoy (all in Philadelphia), and Lynnewood Gardens (in Montgomery County), the latter containing 1796 apartment units.

The commission concedes that a landlord would not be a public utility if its charge for utility service is included, un-itemized, in a flat rental. The commission contends, however, that appellant's intention to re-meter the service, charge separately for it, and make a profit presents a "different situation" and results in the proposed service being public in nature.[12] However, it is apparent that whether or not the utility charge is included in a flat rental or determined through sub-metering, it still constitutes compensation to the land-lord. We fail to see how the method of computing the charge for the utility service is in any sense determinative of or relevant to the issue of whether the service is "to or for the public". "The charge to the tenant based upon the amount which the particular tenant actually uses (as proposed in this application) is far more equitable to the tenant than imposing a hidden and unidentified item in the rental charge without any showing by the landlord of the basis on which the util-ity charge is calculated."[13]

Even the members of the Superior Court who voted to uphold the commission's order stated "that the dis-tinction made by the Commission between including the cost of utility service in a flat rental charge and submetering is a distinction without a difference and the question on this appeal does not turn on that

---

[12] In its brief, the commission says: "Appellant would have this Honorable Court believe that there is considerable submeter-ing by landlords without certificates of public convenience from the Commission. . . . Obviously the minority opinion [apparently of the Commission] and appellant confuse those situations where a land-lord receives wholesale rates *and includes the cost of these services in the rent*, with the obviously different situation involved in the instant appeals. Admittedly the Pennsylvania Utility Commission is not a rent control Commission and has asserted no jurisdiction over rents." (Emphasis in original.)

[13] From the dissenting opinion of the commission chairman. 41 Pa. P.U.C. at 519.

fact."[14] These judges also said with respect to situations where the charge is included in the rent: "We are not so naive as to believe that the cost of utilities are supplied free to the tenants; nor so naive as to believe that the landlord does not make a profit under such circumstances."[15]

However, we cannot agree with the view, expressed by the three affirming judges of the Superior Court, that the present case may be distinguished from *Overlook* and *Aronimink* on the basis of the sequence of ownership of the equipment involved. In the view of those judges, the cases are distinguishable on the theory that apartment owners or landowners initially owned the equipment in *Overlook* and *Aronimink* while in the present case the equipment, from the time of installation to the application for transfer, has been owned by public utilities subject to commission jurisdiction.

The determination of whether appellant would be serving the public after the transfers are completed is unrelated to the identity of the transferor of the designated assets or to the fact that the equipment previously had "been dedicated to the public use and impressed with a public interest."[16] The equipment possesses no

---

[14] 206 Pa. Superior Ct. at 135, 212 A. 2d at 233.

Thus, in this regard, the commission dissenters and both the three affirming and two of the dissenting judges of the Superior Court were in agreement.

[15] 206 Pa. Superior Ct. at 135, 212 A. 2d at 233.

A significant decision, not discussed by the majority of the commission in the present case, is *Pa. P.U.C. v. Phila. Elec. Co.*, 23 Pa. P.U.C. 320 (1942). In that decision the commission determined that it would not prohibit the remetering or resale of current by the owner of an office building to his tenants. For a further discussion of the case, see note 20, infra.

[16] 206 Pa. Superior Ct. at 136, 212 A. 2d at 234. This concept, taken from *rate-making decisions* (e.g., *Pittsburgh v. Pa. P.U.C.*, 165 Pa. Superior Ct. 519, 528, 69 A. 2d 844, 849 (1949), allocatur denied, 165 Pa. Superior Ct. xxv), is here misapplied when utilized as a consideration in determining whether the service which ap-

mystical qualities or characteristics which render the service for which it is utilized a public service irrespective of the private or public nature of the services or the definite (tenants) or indefinite (public) identification of the persons served. The determination as to whether appellant would be engaged in a public utility service cannot be predicated upon whether it originally installed the necessary equipment at the time of construction, later installed it itself, or purchased it from a utility which had originally installed it.[17]

We hold, therefore, that the proposed service which appellant would render in the present case would not constitute it a public utility within the meaning of Section 2 of the Public Utility Law since such service would not be furnished "to or for the public".

In the alternative, the commission held that the transfers could not be approved even if appellant would not be rendering a public utility service upon consummation of the proposed transfers because the commission could not "disregard the public interest and abandon the public and the consumers who would become affected by the approval of the applications, to uncer-

---

pellant seeks to render to its tenants constitutes public service under the Public Utility Law. Such application, if correct, would, for all practical purposes, always preclude a transfer of utility equipment to a nonutility because, once included in the rate structure of a public utility, that equipment would be immutably stamped with public use and interest characteristics.

[17] The dissenting opinion in the Superior Court quite aptly stated: "If the facilities here involved had been originally installed by the landlord under single metering and wholesale rates granted to the landlord by the utilities, there would be no doubt of the validity of the transaction. As the record in this case shows, such operations exist in Pennsylvania. The circumstance that the landlord now seeks single meter and wholesale rates should make no difference in the result. What is legal in one case does not thereby become invalid in the other. The sequence of events should not be controlling." 206 Pa. Superior Ct. at 125, 212 A. 2d at 235.

tain but definitely less desirable prospects."[18] The members of the Superior Court who voted to affirm the commission agreed with its position, stating that "the Commission, in exercising its administrative discretion, not only may but should deny the transfer of patrons out from under regulation, even where their consent has been obtained, in circumstances such as this case presents, in the public interest and as a matter of public policy."[19]

In support of this alternative holding, the commission engaged in much speculation as to possible evils which would flow from consummation of the proposed transfer.[20] In substance, however, the position of both

---

[18] 41 Pa. P.U.C. at 512.

Presumably, the commission acted under §202 of the Public Utility Law. Act of May 28, 1937, P. L. 1053, as amended, 66 P.S. §1122. That section requires the commission's approval, evidenced by a certificate of public convenience, prior to the transfer of assets by a public utility to any person and prior to any abandonment of any service to patrons. The issuance of such a certificate is based upon the commission's determination that it is necessary or proper for the service, accommodation, convenience, or safety of the public. Although factual and legal questions have been raised which cast doubt on the applicability of that portion of §202 which involves abandonment of service, the commission has made no specific findings with respect to such questions and our disposition of this appeal makes it unnecessary for us to express our views respecting them.

[19] 206 Pa. Superior Ct. at 134-35, 212 A. 2d at 233.

[20] For example, the commission suggested that, without its supervision, Drexelbrook tenants might eventually be subject to discrimination in rates as compared to other tenants who are protected by commission jurisdiction; that the practice of submetering and resale might adversely affect the revenue return of the public utility companies involved and cause increases in rates to the remaining customers of such utilities, and, in the alternative, that a change in rate structure increasing wholesale prices might make the landlord's utility service unprofitable. The commission also voiced concern over possible inaccuracies in meters.

the commission majority and the affirming members of the Superior Court can be reduced to the proposition that it is against public policy to approve the transfer since it would remove from commission supervision service now subject to its jurisdiction. Such reasoning disregards the express formulation of public policy by the Legislature embodied in the statutory definition of the term "public utility". That provision confers jurisdiction on the commission *only* where the service involved is rendered "to or for the public". The

It is appropriate to recall the words of the commission in *Pa. P.U.C. v. Phila. Elec. Co.*, 23 Pa. P.U.C. 320 (1942), when it expressly refused to prohibit remetering by a landlord: "[W]e deem it appropriate to state that we have considered the advisability of a rule absolutely prohibiting remetering or resale of current. The so-called 'practical' difficulties envisaged by respondent as resulting from such a rule do not require detailed comment, but it may be observed that some predictions could not reasonably be expected to eventuate and the fulfillment of others might well produce compensating benefits. Also, we have no doubt of our jurisdiction to consider the reasonableness and justness of any tariff rule and the practice thereunder, and to take appropriate corrective action if the rule appears unreasonable or its application unjust. Hickey v. Phila. Elec. Co., 122 Pa. Superior Ct. 213, 220 (1936). Aside from 'practical' considerations and technical objections to jurisdiction and procedure, our decision not to require prohibition of remetering or resale turns upon our conclusion that the record does not show such a requirement to be necessary at this time for public protection . . . ." 23 Pa. P.U.C. at 322.

This language of the commission is especially notable and meaningful because it was directly at odds with the opinion of a dissenting member of the commission. The dissenting commissioner contended that "the prohibition of resales of electrical current involving a profit to landlords is a requirement that is necessary for public protection." 23 Pa. P.U.C. at 324. The dissent also stated: "When the Philadelphia Electric Company sells to a landlord and the landlord resells to a tenant at a profit to the landlord, the landlord in my opinion becomes a public utility and has no right to extort a profit for such sale." 23 Pa. P.U.C. at 323.

It is significant that, in the face of this dissent, the majority of the commission held otherwise.

controlling consideration is not whether regulation is desirable, but whether appellant is subject to regulation under the Public Utility Law. *Klawansky v. P.S.C.*, 123 Pa. Superior Ct. 375, 382, 187 Atl. 248, 251 (1936). If the Legislature did not deem it necessary to confer jurisdiction on the commission with respect to the service proposed by appellant (as the commission conceded for purposes of its alternative holding), then the absence of such jurisdiction as a result of the consummation of the proposed transfers would not and could not contravene public policy. Furthermore, the possible evils which the commission envisaged as a result of the absence of its supervision could come to fruition irrespective of whether a landlord originally installs facilities or later purchases them from a public utility, or whether the charge for service is on a metered basis or included in a flat rental without itemization. It seems obvious that the same projected evils which the commission majority envisaged as possibilities in the present case may be equally posited in other instances and cases previously approved by the commission and the Superior Court.[21]

We hold, therefore, that the commission erred as a matter of law in holding that Drexelbrook Associates would become a public utility upon consummation of the proposed transfers, and that the commission also erred in alternatively holding that the allowance of the transfers would contravene public policy if the commission thereby lost its jurisdiction over the service involved.

---

[21] See *Pa. P.U.C. v. Phila. Elec. Co.*, 23 Pa. P.U.C. 320 (1942) (supra, note 20) ; *Aronimink Transp. Co. v. P.S.C.*, 111 Pa. Superior Ct. 414, 170 Atl. 375 (1934) (supra, text at 435) ; *Borough of Ambridge v. P.S.C.*, 108 Pa. Superior Ct. 298, 165 Atl. 47 (1933) (supra, text at 434-35) ; *Overlook Dev. Co. v. P.S.C.*, 101 Pa. Superior Ct. 217, aff'd per curiam, 306 Pa. 43, 158 Atl. 869 (1932) (supra, text at 435). See also note 11, supra.

The order is reversed. The record is remanded and the commission is directed to approve the applications and to issue the appropriate certificates.

DISSENTING OPINION BY MR. JUSTICE COHEN:

Today the majority decides that Drexelbrook, a supplier of utility service for compensation, cannot be a public utility, within the meaning of the Public Utility Law, because those to be "serviced consist only of a special class of persons—those to be selected as tenants [of Drexelbrook]—and not a class open to the indefinite public". "Such persons", says the majority, "clearly constitute a defined, privileged and limited group and the proposed service to them would be private in nature." In short, the majority's position is that where a consumer's receipt of utility service from a particular supplier is conditioned upon his being a tenant of that supplier, then, ipso facto, that consumer is not entitled to the assurance of the Pennsylvania Public Utility Commission that he will receive adequate service at a reasonable rate.

The facts of this particular case, involving as it does thousands of consumers, residential and commercial, comprising a small community, strongly suggests the fallacy of the majority's position. It is not difficult to envision a community of 20,000 consumers who are all tenants of a handful of landlords. The landlords would purchase utility services wholesale from the public utilities and would distribute them to their tenants at a profit. If the majority rule is correct, the handful of giant landlords comprises or is part of the consuming public whom the Public Utility Law protects from unreasonable rates and inadequate service, while the 20,000 tenants comprise a handful of "special class[es] of persons" "and not . . . the indefinite public" and, therefore, are left to the tender mercies of their landlords regarding adequate utility service at reasonable rates.

Actually, if the majority is correct, then, in the preceding example, the public consumer, whom the Legislature intended to protect, has disappeared into thin air. The landlord is little more than a middleman, distributing the services for a profit. He "consumes" little if any of the service himself. He has taken the place of a distribution subsidiary of the public utility. On the other hand, the individuals who are actually consuming the service are, according to the majority, members of a "privileged class" and not the public. Thus, the public and the public interest has vanished, relieving the public utility of its duty to service the public at large, except for a handful of distributors who require little if any protection, and who, in fact and in common sense, should be regulated as a public utility while distributing utility services to those who really comprise the consuming public.

It is surprising that the majority reaches such a result in the absence of compelling precedent. *Overlook Development Co. v. P. S. C.*, 101 Pa. Superior Ct. 217 (1931), affirmed per curiam, 306 Pa. 43 (1932), involved the question of whether or not the Public Service Commission had issued a confiscatory order when it required a land developer, who had laid his own water pipes through which a public utility water company was supplying water, to allow an adjacent landowner to hook up with his pipes. We affirmed the Superior Court's holding that allowing the water company to supply water through his pipes to those who purchased plots from him did not constitute a dedication of his pipes to public use. In this respect, we said that those limited persons receiving water through the developer's pipes did not constitute the "public" *for purposes of dedication.* It will be noted that in *Overlook* the consumers who did not comprise a "public" for purposes of dedication were, nevertheless, part of the "public" who were entitled to and in fact were

receiving service directly from a public utility and the protection of the Public Service Law.

In *Borough of Ambridge v. P. S. C.,* 108 Pa. Superior Ct. 298, 165 Atl. 47 (1933), the Superior Court held that a corporation which supplied itself and *one* neighboring manufacturer with water was not serving the "public". In *Aronimink Transportation Co. v. P. S. C.,* 111 Pa. Superior Ct. 414, 170 Atl. 375 (1934), the Superior Court held that the landlord's provision of transportation to his several hundred tenants between his apartment houses and a subway or streetcar terminal was not a service to the public. But in neither *Ambridge* nor *Aronimink* was there any suggestion that the consumers could not, if they desired, obtain the same service from a public utility and be protected in their dealings with it. The context of both *Ambridge* and *Aronimink* is the problem of whether there is *competition* between utility suppliers in dealing with the public which may be damaging to the public interest. In that context it was decided that the supply of service to a limited group of persons was not service to the "public". But it has never been decided that because a supplier services only a limited group that group is not *part of the public* entitled to protection of the public utility law when that supplier is the only available source of service.

The authorities relied upon by the majority are neither apposite nor binding upon this Court in this case; and the general definition of "public" developed in those authorities in a different context should not be mechanically applied to the problem before us. In short, Drexelbrook, by its contract with the public utility, has obtained a *captive public* whose members have relationships with the supplier that are not so unique or individual as to abrogate their right to protection by the utility law or make such protection impractical. The problem which the majority does not

446

face can become only more aggravated with the continuation of the trend of absorption of the consuming public into large scale leasing projects of residential and commercial characters.

I dissent.

Mr. Justice EAGEN concurs in this dissenting opinion.