Crown American Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent. Pennsylvania Power and Light Company (PP&L) et al., Intervenors.

Argued April 7, 1981, before President Judge CRUMLISH, JR. and Judges MENCER, ROGERS, CRAIG and PALLADINO. Reargued September 14, 1982, before President Judge CRUMLISH, JR. and Judges ROGERS, BLATT, WILLIAMS, JR., CRAIG, MACPHAIL and DOYLE.

*Charles B. Zwally, Shearer, Mette & Woodside,* with him *James M. Gdula,* Corporate General Counsel, for petitioner.

*Daniel P. Delaney,* Assistant Counsel, with him *Joseph J. Malatesta, Jr.* and *Charles F. Hoffman,* Chief Counsels, for respondent.

*David J. Dulick,* with him *G. D. Caliendo,* for intervenor, Pennsylvania Power & Light Company.

*Walter W. Cohen,* Consumer Advocate, with him *Philip McClelland* and *Martha Bush,* Assistant Consumer Advocates, and *Andrew Hermann,* for intervenor, Consumer Advocate.

OPINION BY JUDGE WILLIAMS, JR., August 12, 1983:

Crown American Corporation (Crown) has appealed to this Court from an order of the Pennsylvania Public Utility Commission (PUC). That order

approved a tariff supplement filed by the Pennsylvania Power and Light Company (PP&L).

On April 6, 1978, PP&L filed with the PUC a tariff supplement containing rules and regulations designed to promote energy conservation. In proposed Rule 5F of the supplement, the utility sought to modify its existing tariff by prohibiting the master metering of electricity at new multi-tenancy commercial service locations.[1] In response to complaints filed by numerous parties, including Crown, which owns and manages several shopping malls located within PP&L's service territory, the Commission suspended the effective date of the supplement and ordered an investigation into the reasonableness and lawfulness of the supplement's proposed rules and regulations. Following seven days of hearings in which Crown participated, the Administrative Law Judge (ALJ) issued a recommended decision and order which, *inter alia,* approved the proposed ban on master metering. On March 28, 1980, that portion of the ALJ's order approving Rule 5F was adopted by the full Commission,[2] and this appeal by Crown followed.

Master metering is a method of rendering electrical service whereby a utility delivers electricity to a multi-unit building at a central point. A meter is installed by the utility at this point to measure all elec-

---

[1] Other provisions of the supplement established mandatory minimum insulation standards as a precondition to the provision of electrical service to newly constructed buildings and removed limitations in "total electric" rate schedules. In *Pa. Builders Ass'n. v. Pa. Pub. Util. Comm'n.,* 60 Pa. Commonwealth Ct. 438, 431 A.2d 1157 (1981), we held that the Commission was precluded from approving the mandatory building insulation standards of PP&L's tariff supplement, since such standards were inconsistent with the standards established by the Building Energy Conservation Act, Act of December 15, 1980, P.L. 1203, *as amended,* 35 P.S. §§7201.101 *et seq.*

[2] Other portions of the ALJ's recommended decision and order were adopted by the Commission with modifications.

308

trical consumption for that complex, and electricity is distributed to the tenants of the building by the landlord. Pursuant to the master metering provisions of PP&L's existing tariff, the method by which a tenant of a multi-tenancy building is charged for individual electrical usage is a matter left to the agreement of the landlord and the tenant. Under such arrangements, a tenant may be submetered, and thus charged by the landlord for actual individual electrical consumption, charged an unspecified fee for electric service as part of the rental package, or charged a separate and distinct flat fee based on factors other than specific electrical usage. In short, electricity may be resold by the owner of the building to the tenant under a variety of arrangements. Pursuant to proposed Rule 5F, however, master metering is prohibited, so that each occupant of a "multi-tenancy commercial building" requiring installation of electric service after the effective date of the supplement must, with certain exceptions,[3] be served, metered and billed individually as a customer of PP&L. The term "multi-tenancy commercial building" is defined by Rule 5F of the supplement as "includ[ing] any structure

---

[3] Rule 5F permits master metering of multi-tenancy commercial buildings where installation of electric service has been completed prior to the effective date of the rule, and where a "definite commitment" to permit master metering has been made prior to that date. In addition, at service locations connected after the effective date of the rule, an owner of a multi-tenancy commercial building may seek an exception to Rule 5F by demonstrating that the installation of individual electric meters at each separate unit within the building is "neither feasible nor practical from a financial, technical, or engineering point of view or by citing any other valid reason. . . ." Lastly, submetering may be permitted by PP&L at new service locations where: (1) it is impractical for PP&L to bill each tenant separately; (2) each tenant has control over a major portion of its electrical usage; and (3) substantial energy conservation will be effected by submetering.

which contains or houses 3 or more separate and distinct residential or commercial units.''

On appeal to this Court, Crown initially asserts that the PUC did not have the authority to approve a tariff rule prohibiting master metering of multitenancy commercial buildings and requiring direct metering of tenants. For the following reasons, we disagree.

The PUC's plenary jurisdiction over the operations of public utilities in the Commonwealth is clearly expressed in the Public Utility Code (Code), 66 Pa. C. S. §§101 *et seq.* Section 501 of the Code, 66 Pa. C. S. §501, provides in pertinent part:

(a) ... In addition to any powers expressly enumerated in this part, *the commission shall have full power and authority, and it shall be its duty to enforce, execute and carry out, by its regulations, orders, or otherwise, all and singular, the provisions of this part,* and the full intent thereof....

(b) ... *The commission shall have general administrative power and authority to supervise and regulate all public utilities doing business within this Commonwealth.* ... (Emphasis added.)

Under this Section of the Code, the PUC has the broad authority to supervise and regulate all utilities within the Commonwealth, and the power to enforce, execute and carry out the provisions of the Code by its rules, regulations and orders. In addition, Section 1501 of the Code, 66 Pa. C. S. §1501, confers upon the Commission the authority to ensure the furnishing and maintenance of adequate and reasonable services by utilities, and the power to regulate and approve the conditions under which a utility renders service:

Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable

service and facilities. . . . Such service and facilities shall be in conformity with the regulations and orders of the commission. *Subject to the provisions of this part and the regulations or orders of the commission, every public utility may have reasonable rules and regulations governing the conditions under which it shall be required to render service.* . . . (Emphasis added.)

In the instant matter, the requirement that tenants of multi-tenancy commercial buildings be individually metered and billed by PP&L is a condition-of-service rule, which the PUC clearly had the authority to review and approve under the above-quoted provisions of the Code.[4]

Having determined that the PUC had the statutory authority to approve Rule 5F, we turn to Crown's next contention, which is founded upon Section 1502 of the Code, 66 Pa. C. S. §1502. This Section, entitled "Discrimination in service," provides:

*No public utility shall, as to service,* make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or *subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage.* No public utility shall establish or maintain any unreasonable

---

[4] Crown strenuously argues that our Supreme Court's decision in *Drexelbrook Assocs. v. Pa. Pub. Util. Comm'n.*, 418 Pa. 430, 212 A.2d 237 (1965), compels a contrary conclusion. We disagree. In *Drexelbrook*, the PUC attempted to assert its jurisdiction over a landlord which supplied utility services to tenants by submetering. The Court held that such a landlord was not a public utility, and hence was not subject to the regulatory authority of the PUC. Here, by contrast, the PUC did not attempt to regulate landlords by approving Rule 5F of PP&L's tariff supplement. Instead, the PUC asserted its authority over a public utility by approving a condition-of-service rule.

difference as to service, either as between localities or as between classes of service, but this section does not prohibit the establishment of reasonable classifications of service. (Emphasis added.)

Crown maintains that Rule 5F unlawfully discriminates against owners of multi-tenancy commercial buildings requiring installation of electrical service after the effective date of the rule. It argues that the rule subjects the owners of such complexes, who cannot master meter electricity, to an unreasonable disadvantage, because they cannot "compete" with multi-tenancy commercial owners who complete installation prior to the effective date of the rule, who are permitted to master meter. In essence, the disadvantage which Crown claims is purely an economic one: owners of commercial complexes who cannot master meter under Rule 5F will not be able to purchase electrical energy from PP&L at volume discount rates, and consequently will not profit by the reselling of electricity to tenants at higher prices.

Crown's argument is untenable as a basis for the rejection of Rule 5F. Any economic disadvantage which may be the result of the rule is not unreasonable, because the protection of Crown's economic interests and competitive position, and of those similarly situated, is neither an objective of Section 1502 nor of the regulatory scheme of the Code in general. *See Pennsylvania Petroleum Association v. Pennsylvania Power & Light Company*, 488 Pa. 308, 412 A.2d 522 (1980). We therefore conclude that the proposed prohibition of master metering does not subject owners of commercial complexes seeking connection to electrical service after the effective date of Rule 5F to any undue disadvantage as to service.

Lastly, Crown contends that the PUC's order approving Rule 5F as a conservation measure is unsup-

ported by substantial evidence. In this regard, Crown protests that PP&L did not present evidence demonstrating that the prohibition of master metering would encourage energy conservation by tenants of multi-tenancy buildings used for *non-residential* purposes. In addition, Crown argues that the evidence in support of the rationale of the rule is deficient because PP&L did not offer any evidence showing that tenants who are individually metered and billed directly by a utility would consume any less energy than tenants who are submetered by their landlords, who are also apprised of their actual energy costs.

As previously indicated, Rule 5F is applicable to "multi-tenancy commercial buildings," which are defined by the rule to include both residential complexes and buildings used for commercial purposes. Admittedly, PP&L offered no evidence with respect to the impact of individual metering on energy consumption in multi-tenancy buildings used for commercial purposes. There is ample record evidence, however, indicating that tenants of residential multi-family dwellings who are individually metered, and thus are made aware of their true energy costs, substantially reduce their energy consumption to decrease those costs. This evidence, and the inferences which may be reasonably drawn therefrom, adequately support the Commission's conclusion that energy will be conserved by applying Rule 5F to commercial complexes as well as to multi-tenancy residential buildings.

Furthermore, the PUC's approval of a rule prohibiting *all* master metering, including submetering, as a means of promoting energy conservation was an act within its flexible area of judgment. Since the evidence supports the conclusion that individual metering and billing will encourage the reduction of energy consumption, we will not interfere with that judgment

simply because submetering might accomplish that same result.[5]

For the foregoing reasons, we affirm the Commission's approval of Rule 5F of PP&L's tariff supplement.

### ORDER

AND Now, the 12th day of August, 1983, the order of the Pennsylvania Public Utility Commission entered March 28, 1980, Commission Docket No. R-78040578, is affirmed insofar as it ordered the prohibition, with exceptions, of installation of master metering in multi-tenancy commercial buildings.

---

[5] Our scope of review of PUC decisions is limited to a determination of whether constitutional rights were violated, an error of law committed, and whether the order and its complementing findings and conclusions are supported by substantial evidence. *Allied Dev. and Bldg. Corp. v. Pa. Pub. Util. Comm'n.*, 60 Pa. Commonwealth Ct. 207, 430 A.2d 1239 (1981). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Burleson v. Pa. Pub. Util. Comm'n.*, 66 Pa. Commonwealth Ct. 282, 443 A.2d 1373 (1982).

---

### DISSENTING OPINION BY JUDGE CRAIG:

The order of the Pennsylvania Public Utility Commission (PUC) should be reversed insofar as it prohibits the master metering of electricity in all new "multi-tenancy commercial buildings" because the record lacks substantial evidence to show that the proposed tariff rule would achieve energy conservation, and, consequently, the only purpose and effect of the proposed tariff modification is to enlarge the utility's revenues by necessarily reducing the number of opportunities for customers to benefit from volume discounts.

### 1.

Where the PUC investigates a public utility's proposed modification of its rates or regulations, the pub-

lic utility has the burden of proving the reasonableness of the modification. 66 Pa. C. S. §315. Pennsylvania Power and Light Company (PP&L) asserts that its proposed prohibition of master metering, and resultant promotion of individual metering, will produce energy conservation by causing tenants to learn their true energy costs and thus be motivated to reduce their energy consumption.

Even if the truth of that assertion is assumed, PP&L has nevertheless failed to demonstrate a rational relationship between its stated goal of energy conservation and its proposed comprehensive ban of master metering which would encompass buildings whose tenants are submetered and thus apprised of their energy costs. To the contrary, PP&L's expert witness testified that the electric consumption/conservation of submetered tenants would be proportionately equivalent to the electric consumption/conservation of individually metered tenants if both groups were billed at the same rate, *i.e.*, had proportionately identical costs. Because PP&L did not offer any evidence of differences in the billing rates of individually metered and submetered tenants, PP&L did not meet its burden of proving that its proposed tariff rule would achieve the avowed goal of energy conservation.

### 2.

With the alleged energy conservation purpose absent, the result of the proposed master metering prohibition is obviously to eliminate the volume discount savings which the commercial center operator can receive as a result of master metering, and, depending upon leasehold bargaining, may or may not share with tenants.

A tariff change which produces additional revenue not shown to be required to provide a reasonable return to the utility, and which has only the effect of

shifting economic benefit from ratepayers to the utility, cannot properly be approved by the PUC, nor should such an approval be affirmed by this court.

Judge BLATT joins in this dissent.