**Russell ADAMS, John F. Adams, and Beverly J. Hamilton, Petitioners,**

v.

**PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 6, 2002.

Decided March 21, 2003.

Donald D. Saxton, Jr., Washington, for petitioners.

. . . .

Q And again you returned with Rite Way Electric in January of 1993?

A Yes.

Q And in the same capacity?

A Yes, installation worker.

Notes of Testimony, Hearing of August 30, 1993, at 16, 18–23.

Shane Rooney, Harrisburg, for respondent.

Kevin C. Abbott, Pittsburgh, for intervenors, Columbia Gas Transmission and Columbia Gas of PA.

Before PELLEGRINI, J., LEAVITT, J., and KELLEY, Senior Judge.

OPINION BY Judge LEAVITT.

Russell Adams, John F. Adams and Beverly J. Hamilton (Petitioners) petition for review of an adjudication of the Pennsylvania Public Utility Commission (PUC) that dismissed their petition a declaratory relief. Specifically, Petitioners requested the PUC to order the Columbia Gas Transmission Corporation (Columbia Transmission) and the Columbia Gas of Pennsylvania, Inc. (Columbia Gas) to provide them natural gas service. The PUC, however, held that it lacked jurisdiction to dispose of what it found to be a private contractual dispute. We affirm.

Petitioners own a parcel of land (Property) located in Greene County, Pennsylvania, which has been the subject of a series of leases for oil and gas rights. Under the first lease, dated September 4, 1899, Albert Owen, W.M. Owen and E.A. Owen granted W.H. Ullom the gas and oil rights on the Property. Subsequently, this lease was acquired by Manufacturers Light and Heat Company (Manufacturers), a regulated Pennsylvania public utility. Under the 1899 lease, a number of natural gas wells were drilled, including Well L–1059, which is located on the Property.

On July 29, 1957, Earl Ray Owen and Margaret Owen, the then owners of the Property, agreed to certain lease modifications (1957 Agreement) that are relevant to this case. First, the parties agreed to a fixed lease term of fifty years and a secondary term of "so long as oil or gas can be produced in paying quantities or so long as gas is held in storage or withdrawn from wells or strata underlying the tract or in the immediate vicinity operated by Manufacturers Light and Heat Company and referred to as the 'Majorsville Storage Field.'" Reproduced Record 25 (R.R. ——). Second, the royalty payments were fixed at delivery of 200,000 cubic feet of natural gas *per annum* to the Property owner, free of charge. However, Manufacturers retained the right to charge for gas drawn in excess of 200,000 cubic feet in accordance with its prevailing rates for domestic customers. Third, the 1957 Agreement gave Manufacturers the right to terminate gas service by abandoning its wells and removing its pipelines. Finally, The 1957 Agreement extended its terms to the lessors, heirs, executors, successors and assignees of either party.

As a consequence of a 1971 merger[1] between Columbia Transmission and Manufacturers, Columbia Transmission[2] took the place of Manufacturers in the 1957 Agreement. On August 2, 1991, Columbia Transmission entered into an agreement with Russell T. and Julia Adams, then owners of the Property, entitled "Agreement for Delivery of Free Gas and Overburn Gas Provided by the Lease." (1991 Agreement). R.R. 59a. The 1991 Agreement referenced specifically Well 2878, which is located on land adjacent to the

---

1. We take judicial notice of the merger between Columbia Transmission and Manufacturers Transmission division that was approved by the Federal Power Commission.

2. Columbia Transmission is an interstate natural gas pipeline subject to the jurisdiction of the Federal Energy Regulatory Commission, and the parties agree it is not a regulated public utility subject to the jurisdiction of the Commission.

Property,[3] but it did not alter the basic payment terms set forth in the 1957 Agreement.

On July 16, 2001, Consol Pennsylvania Coal Company (Consol) filed a "Notice of Intention by Well Operator to Plug a Well" with the Pennsylvania Department of Environmental Protection, identifying the target as "Well L–1059." R.R. 35a, 36a. However, on August 9, 2001, Columbia Transmission advised Petitioners that "Well 2878" would be plugged and abandoned by October 15, 2001; it further advised Petitioners that once the well was plugged, Petitioners' rights to free service under the 1991 Agreement would terminate. R.R. 33a.

In response, Petitioners filed a Petition for Declaratory Order with the PUC on August 28, 2001, seeking to compel Columbia Transmission and Columbia Gas to continue to deliver natural gas to them or to provide substitute service.[4] Their petition claimed that the object of both the 1957 and 1991 Agreements was Well 2878, not Well 1059, which was not even operable in 1957. Thus, it decided that Consol must be replugging Well 1059, and Well 2878 must be still producing, thereby entitling Petitioners continued royalties from the respondents in the form of natural gas service.

Columbia Gas filed a Motion to Dismiss and Answer, contending that the PUC lacked jurisdiction over the matter because Petitioners received natural gas service pursuant to a private contract and not pursuant to the published tariff of a regulated utility. Further, Columbia Gas contended that it acted solely as an agent of Columbia Transmission and, as such, was not a proper party. Columbia Transmission also filed a Motion to Dismiss and Answer, agreeing with Columbia Gas that the PUC lacks subject matter jurisdiction over private contracts such as the 1899 lease, the 1957 Agreement or the 1991 Agreement.[5] Columbia Transmission also challenged the PUC's ability to issue an order to it because, as an interstate gas pipeline, it is subject to the exclusive jurisdiction of the Federal Energy Regulatory Commission.

On June 13, 2002, the PUC granted the Motions to Dismiss. The PUC held that it lacked jurisdiction because the dispute arose from a private contract to which neither party was a public utility subject to its regulation. It agreed that Columbia Gas, which is a regulated utility, was not providing utility service but, rather, administrative service as an agent of Columbia Transmission. Petitioners then sought our review.

On appeal, the Adams argue, *inter alia,* that Columbia Transmission and Columbia Gas have violated the requirements of 66 Pa.C.S. § 1501,[6] which require continuous

---

**3.** Presumably natural gas on the Property exited Well 2878 thus entitling Property owners to continued payment in the form of natural gas service.

**4.** Consol was originally a named defendant in this action, but is not a party to the current appeal.

**5.** On October 26, 2001, the Petitioners filed a Motion to File an Amended Petition for Declaratory Order Nunc Pro Tunc requesting the PUC to allow the Petitioner to amend their petition to challenge the validity of the

1991 Agreement. Columbia Transmission and Columbia Gas filed a response in opposition, noting that the Petitioners' motion was untimely, failed to conform to the PUC's regulations and did not address or cure the jurisdictional flaws of the original Petition. Petitioners challenge to the PUC's response to their Motion need not be addressed in light of our holding that the PUC lacks jurisdiction over private contracts, such as the 1991 Agreement.

**6.** In relevant part, it provides,

and safe service by public utilities. They contend that the 1957 Agreement imposed these statutory requirements upon Manufacturers and its successors, and the PUC is charged with enforcement of these statutes. Accordingly, they argue it was error for the PUC to dismiss their petition.

■ We begin with an examination of the relevant and applicable contractual language. Section 1 of the 1991 Agreement provides in relevant part as follows:

> Applicant's right to receive gas is derived *solely* from referenced lease, and *the delivery of gas by Transmission Company to applicant* is not to be construed as a recognition of Applicant's right to be supplied with gas under any other condition or circumstances.

R.R. 59a. (emphasis added). Section 2 of the 1991 Agreement recites that Columbia Gas functions as the agent of Columbia Transmission,

> to install, maintain, and operate the service regulator(s), the meter, and all related fittings from the tap through the meter, and to perform associated services in the handling of the [Adams] account, including the collection of any monies due from [the Adams] to [Columbia] Transmission Company on account of the delivery of overburn gas.

R.R. 59a. These provisions could scarcely be clearer that[7] Petitioners' right to natu-

ral gas service is derived entirely from a private contract and not from "another circumstance," such as a certificate of public convenience or a filed tariff.

■ First, the 1991 Agreement makes it clear that Columbia Transmission, not Columbia Gas, is the entity that provides Petitioners with natural gas service. Columbia Transmission is not regulated by the PUC but by the Federal Energy Regulatory Commission. Columbia Gas is regulated by the PUC when it provides utility services. Here, it only provides administrative services to Petitioners, and the PUC does not regulate administrative services, even when provided by a public utility.

Second, Section 1 of the 1991 Agreement states that the rights of Petitioners derive "solely" from the leases and not from any other condition or circumstance. Even if Columbia Transmission were regulated by the PUC, it did not provide gas service to Petitioners in its capacity as a utility but as a purchaser of mineral rights for which payment was made in the form of gas service, as opposed to cash.

Thus, the 1991 Agreement demonstrates that Petitioners' service was not provided by a regulated utility pursuant to an approved tariff and a certificate of public convenience. The PUC correctly declined jurisdiction. However, Petitioners con-

---

Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public. Such service also shall be reasonably continuous and without unreasonable interruptions or delay. Such service and facilities shall be in conformity with the regulations and orders of the commission. Subject to the provisions of this part and the regulations or orders of the commission, every public utility may have reasonable rules and regulations governing the conditions under which it shall be required to render service.
66 Pa.C.S. § 1501.

7. When reviewing a contract, we must review and consider the entire instrument giving effect to all its provisions and construing it according to the plain meaning of its language. *Grant v. Southwestern Pennsylvania Water Authority,* 144 Pa.Cmwlth. 638, 601 A.2d 1359 (1992).

tend that it is the 1957 Agreement, not the 1991 Agreement, that is dispositive of the PUC's jurisdiction. They contend that under the 1957 Agreement, Manufacturers was obligated to provide regulated public utility gas service, in addition to the free service, as royalties, and this obligation had been assumed by Manufacturers' successor. In support, they note that the 1957 Agreement allowed Manufacturers to charge for service in excess of 200,000 cubic feet using the rate established for its "domestic customers."

The 1957 Agreement[8] did not obligate Manufacturers to provide natural gas to the public, which is the hallmark of a public utility. *Drexelbrook Associates v. Pennsylvania Public Utility Commission*, 418 Pa. 430, 212 A.2d 237 (1965). It obligated Manufacturers to pay royalties for its mineral rights in the form of a prescribed amount of natural gas service, *i.e.,* 200,000 cubic feet *per annum.* Thereafter, Manufacturers had the right to charge Petitioners at a rate equivalent to what it charged domestic customers; the contract does not even reference a PUC regulated tariff. However, even if the 1957 Agreement established the excess charge by incorporating by reference Manufacturers' approved tariff, the result would be the same. The excess charge resulted from free negotiations and whether expressed by reference to a published tariff or to a published tide chart, this charge does not create jurisdiction in the PUC. It is the contract, not the publication, that is the source of Petitioners rights, obligations and remedies.

The rights asserted by Petitioners derive from a private contract, and the PUC lacks jurisdiction over private contractual disputes. *Allport Water Authority v. Winburne Water Company,* 258 Pa.Super. 555, 393 A.2d 673 (1978). Accordingly, the decision of the Commission is affirmed.

### ORDER

AND NOW, this 21st day of March, 2003, the order of the Public Utility Commission dated June 13, 2002, in the above-captioned proceeding is hereby affirmed.

---

8. We also note that the 1957 Agreement provided for the "gas to be used at the Lessors own risk and Lessee not be in any way liable for insufficient supply caused by the use of pumping stations, breakage of lines or otherwise." R.R. 63a. This assumption of risk by Petitioners is inconsistent with their claim that they are receiving public utility services pursuant to 66 Pa.C.S. § 1501. *See* n. 6 *infra.*