**WARWICK WATER WORKS, INC., Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 5, 1997.

Decided June 4, 1997.

Publication Ordered Aug. 18, 1997.

Steven M. Romano, Paoli, for petitioner.

Rhonda L. Daviston, Harrisburg, for respondent.

Before McGINLEY and LEADBETTER, JJ., and LORD, Senior Judge.

LORD, Senior Judge.

Warwick Water Works, Inc. (Warwick) appeals a Public Utility Commission (PUC) order overruling Warwick's exceptions to an Administrative Law Judge's (ALJ's) decision in which the ALJ concluded that Warwick was subject to the PUC's jurisdiction and denied Warwick's application to abandon water service to certain customers.

Warwick is a Pennsylvania Corporation which operates water facilities owned by the Knauer–Carr Partnership at St. Peter's Village in Chester County. Warwick's only two shareholders are the same two individuals

who comprise the Partnership. The Partnership owns twenty-three townhouse rental units and two houses in St. Peter's Village. The Partnership also owns wells; Warwick supplies water service from these wells and waste water service to the 23 rental units it owns and also to St. Peter's Condominium Association (Association), which is made up of 19 to 25 property owners at St. Peter's village.

In 1992, the Association filed a complaint with the PUC against Warwick, requesting a determination that Warwick was a *de facto* public utility—providing a utility service to the public without a certificate of public convenience (CPC). In 1993, after a hearing on the Association's complaint, the PUC issued an order holding that Warwick was a public utility as defined in the Public Utility Code at 66 Pa.C.S. § 102, that is, pertinently, "[a] person or corporation now or hereafter owning or operating in this Commonwealth equipment or facilities for ... [d]iverting, developing, pumping, impounding, distributing, or furnishing water to or for the public for compensation." Warwick did not appeal that order, which provided, *inter alia,*

2. [t]hat the Complaint captioned *St. Peter's Condominium Association v. Warwick Water Works, Inc.,* at Docket No. C–923883, be, and hereby is, sustained.

3. [t]hat Respondent Warwick Water Company, Inc., shall file an application for a certificate of public convenience and necessity within thirty (30) days of the date of entry of this opinion and order.

4. [t]hat if Respondent does not file an application for a certificate of public convenience as described in Ordering Paragraph Number 3, above, then it is hereby ORDERED to cease and desist providing water service in violation of the Public Utility Code, effective thirty days after the date of entry of this opinion and order, and shall be subject to such additional sanctions and penalties as may be deemed appropriate, pursuant to the Public Utility Code.

In 1994, Warwick, which asserts it has operated at a loss since 1982 and is required to spend $60,000 to complete repairs to the water and sewage system, filed an application to abandon water service to the Associa-

tion. The Association responded to this application and Warwick Township intervened.

After an evidentiary hearing, the ALJ issued an initial decision and determined that Warwick had not met its burden to show that abandonment of water service was in the public interest. On consideration of exceptions, the PUC adopted the ALJ's initial decision and directed Warwick to file a CPC application and a proposed tariff. Warwick now petitions this Court for review of that order.

On appeal, Warwick initially questions whether the PUC has jurisdiction over it, and asserts that, if so, the PUC's 1993 order gave Warwick the option of discontinuing service to the Association *or* applying for a CPC and proposing a tariff. Warwick also contends, again assuming *arguendo* the PUC's jurisdiction, that when the appropriate legal standards are considered, the PUC plainly erred in denying its application for abandonment.

Warwick argues that the PUC has no jurisdiction because Warwick is not a public utility. Although it acknowledges that "the [PUC] has ruled that it does have jurisdiction over [it] in the supplying of water to the Association," Warwick "does not concede that ruling to be in accordance with the law." (Petitioner's brief, page 6). The PUC counters that Warwick *must* concede that fact, because Warwick chose not to challenge it by appeal of the 1993 order. The issue of whether Warwick was a public utility was raised and determined in that 1993 action resulting in the order directing Warwick to file a CPC. Thus, argues the PUC, Warwick is collaterally estopped from challenging jurisdiction in this action.

■ Assuming that Warwick may now properly question the PUC's jurisdiction over it, we decide that the PUC does have jurisdiction. Whether a service is being offered to the public within the meaning of the Public Utility Code and is therefore properly classified as a public utility subject to the authority of the PUC requires a determination of whether such service is being held out to the general public or to individuals or a limited group. Warwick supplies water and

waste water service to the Partnership's facilities, to the rental properties it owns, and to the Association.

Warwick argues that it makes its services available only to two recipients, the townhouses in which it shares common ownership with the Partnership, and its sole customer, the Association. As to the Partnership's tenants, Warwick asserts that the service is supplied as part of the rental facilities, is not subject to discrete fees, and is provided *only* to its own tenants. Therefore, service to the rental townhouses is clearly outside the PUC's scope. *Drexelbrook Associates v. Pennsylvania Public Utility Commission*, 418 Pa. 430, 212 A.2d 237 (1965). Warwick argues that the only other recipient of it service is the Association. As a limited and defined group, the Association, according to Warwick, is not "the public" as contemplated by the Public Utility Code. Warwick argues that the PUC ignored the *Drexelbrook* approach to defining "service for the public," which is to determine whether the customers are the general public or a defined and limited group, and erroneously emphasized Warwick's lack of control over the Association.

In *Drexelbrook*, two acknowledged public utilities applied to the PUC for the transfer by sale of their water and electric facilities to a limited partnership managing a rental apartment complex. The PUC dismissed the transfer applications, and the Supreme Court reversed the dismissal order, directing the PUC to grant the transfer though holding that the transferee partnership was not a public utility. The Supreme Court held that the proposed service which the limited partnership would offer only to its tenants did not render it a public utility within the meaning of the Public Utility Code, since such service would not be furnished "to or for the public". *Id.*, 212 A.2d at 241.

■ In this case, however, we cannot agree with Warwick that the PUC focused on an irrelevant factor—the absence of "control" or a relationship between Warwick and the Association—in determining that Warwick was a public utility. While the existence of a relationship above and beyond that of provider and customer may not be dispositive of whether the provider is offering service as a private or public entity, when such a relationship exists, it does tend to show the private nature of the service. In *Drexelbrook*, for example, the Supreme Court looked to the case of *Aronimink Transportation Company v. Public Service Commission*, 111 Pa.Superior Ct. 414, 170 A. 375 (1934), for guidance. There, a corporation operated apartment houses and furnished bus transportation to "those who were selected as tenants—a special class of persons not open to the indefinite public," *Drexelbrook*, 212 A.2d at 239. In deciding that the limited partnership managing apartments in *Drexelbrook* was also providing a private, incidental service, the Supreme Court said:

> [i]n the present case the only persons who would receive service are those who have entered into or will enter into a landlord-tenant relationship with [Drexelbrook]. Here as in Aronimink those to be serviced consist only of a special class of persons—those to be selected as tenants—and not the general public. Such persons clearly constitute a defined, privileged and limited group and the proposed service to them would be private in nature.

*Id.*, 212 A.2d at 240.

Thus, it is erroneous to say, as Warwick does here, that there is no legal or logical basis for a discussion of the relationship between Warwick and the Association, for that precisely is one of the factors on which the Supreme Court based its conclusion in *Drexelbrook*.

■ Warwick provides water and waste water service individually to property owners in the Association, as well as to its own properties. There is no special class of persons that it, as the provider, chooses to service. Unlike in *Drexelbrook*, no relationship other than service provider and customer exists as between Warwick and the Association members, who are billed and who make payments individually. The Association members, while limited to a definite number, are an open class of persons, who may sell or lease their property without regard to Warwick. The private or public nature of the utility does not depend on the number of persons served. *Waltman v. Public Utility*

*Commission,* 142 Pa.Cmwlth. 44, 596 A.2d 1221 (1991). The service Warwick provides the Association members is incidental to no other business or service it offers them. We agree with the Commission that Warwick is a public utility as defined in Section 102 of the Public Utility Code—that is, a "corporation ... operating ... equipment or facilities for ... pumping ... distributing or furnishing water to or for the public for compensation."

■ Warwick argues then that the 1993 PUC order offered Warwick two alternatives—to apply for a CPC or to stop providing water service—and now Warwick has elected to stop service to the Association members. Warwick asserts it complied with the order by waiting thirty days and then informing the PUC Law Bureau of its decision.

The PUC counters that the 1993 order directed Warwick not to stop providing water service to the customers it chooses, but to cease and desist *illegal operation* by complying with the Public Utility Code, which requires that a provider have a CPC for its services or face sanctions. The PUC concedes that at most the order is inartfully drafted and argues that no reasonable interpretation of it would allow a provider simply to abandon service unilaterally to some of its customers, as Warwick suggests. We agree.

First, the order must be read as a whole. In paragraph two, the PUC sustained the complaint of the Association. That complaint alleged that Warwick was operating as a *de facto* public utility. As can be seen from ordering paragraphs three and four, the PUC required Warwick, deemed to be a public utility, to apply for a CPC or to cease providing service in violation of the Public Utility Code *and* subject itself to sanctions and penalties. As a public utility, Warwick could in no way provide service legally *without* a CPC. Section 1101 or the Public Utility Code, 66 Pa.C.S. § 1101. While we agree that the order could have been more skillfully drafted, the interpretation of it that Warwick offers is illogical. Moreover, no reasonable person would assume that the PUC would allow a utility the unconditional choice of abandoning some, but not all, of its customers in thirty days time, thereby allowing

the distinct possibility that their households would be without water and sewage service, after finding that utility was in violation of the Public Utility Code. Such a decision by the PUC would be rewarding violative conduct. As a utility, Warwick is obligated to apply for and obtain a CPC, and must obtain a CPC in order to abandon service. Section 1102 of the Public Utility Code, entitled "Enumeration of acts requiring certificate," mandates it. 66 Pa.C.S. § 1102(a)(2).

■ Finally, Warwick argues that in denying its abandonment petition, the PUC implicitly held that Warwick had sufficient fitness to operate a public utility. This decision, says Warwick, ignores the record, which establishes Warwick's difficulty in complying with technical requirements, such as the lack of trained personnel to operate and maintain the system, the diminishing water supply from its wells, and its continual operating losses. As to whether it is entitled to abandon, Warwick argues that it meets the criteria set forth by the PUC in its decisions, looking at 1) the extent of loss to the utility; 2) future use of the facility; 3) the balancing of the hardship between the public and the utility; 4) the availability of alternate supply services; and 5) the feasibility of a rate increase.

Warwick, which has the burden of proof in this case, Section 332(a) of the Public Utility Code, 66 Pa.C.S. § 332(a), contends that it has consistently operated at a loss, and that a rate increase to eliminate that loss would be prohibitive. However, Warwick, in applying for abandonment, does not assert it intends to transfer the system to its abandoned customers. Instead, Warwick intends to eliminate the customers of its choosing and to use the system to supply its own rental properties. Significantly, the ALJ found that Warwick charges the Association members on a $15 per toilet basis while, for example, it assesses one of the properties the Partnership owns a total of $218.89 for 40 toilets, which amounts to an imputed individual rate of $5.47 per toilet. This finding is supported by the testimony of Warwick's partner. (Notes of Testimony, (N.T.), ALJ hearing, June 10, 1994, pp. 73–74, 90–92, Exhibit A–2). The ALJ found from this fact that Warwick

would realize a gain if it would eliminate the discrepancy in rates between those of the Association members and those of the Partnership properties. Thus, as to the first and fifth factors to be considered in acting on an application for abandonment, Warwick has not shown that it would necessarily suffer a loss at all, or that an unreasonable rate increase would be required to cover a loss.

As to balancing Warwick's loss with the hardship to the customers, if a uniform rate were applied to the Association customers and the Partnership's tenants, no hardship would accrue to Warwick because no loss would occur. By contrast, the ALJ found that if Warwick abandoned, the geology of the aquifer on which the property sits would require Association members to drill (or re-drill) wells through granite, costing \$8–10/foot, as opposed to the usual \$2–4/foot. This finding is also supported by the record. (N.T., 6/10/94, pp. 50, 120–126).

■ Finally, as to the availability of an alternative supply, we find Warwick's argument that the Association has done nothing to avail itself of other sources misplaced. It is Warwick's burden to show available alternative sources of supply. *See Monessen Southwestern Railway Co. v. Pennsylvania Public Utility Commission*, 82 Pa.Cmwlth. 13, 474 A.2d 1203 (1984) (applicant for abandonment has the burden, not the customer). We agree with the PUC that the evidence on alternative sources produced by both parties was not particularly compelling and was to no small degree speculative. However, we can say, having reviewed the testimony and other evidence in its entirety, that Warwick did not show that existing wells on the each of the Association members' properties could be easily and inexpensively re-opened, as Warwick alleged, or that other sources were available. Testimony that the customer did not investigate the possibility of other sources is not the same as testimony that an alternative source is ready and sufficient for immediate use.

We find that the PUC's findings are supported by substantial evidence and we see no legal error or violation of constitutional rights in its determination. We are therefore bound to uphold the PUC's decision.

*Leung v. Pennsylvania Public Utility Commission*, 136 Pa.Cmwlth. 194, 582 A.2d 719 (1990).

Affirmed.

### ORDER

AND NOW, this 4th day of June, 1997, the order of the Pennsylvania Public Utility Commission, No. A–210052F2000, dated August 9, 1996, is hereby affirmed.