IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Burhans-Crouse Funeral Home, :
                Petitioner :
                 :
          v. :
                 :
Pennsylvania Public Utility :
Commission, : No. 500 C.D. 2024
           Respondent : Submitted: February 4, 2025


BEFORE:   HONORABLE ANNE E. COVEY, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE MARY HANNAH LEAVITT, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                            FILED: March 5, 2025

Burhans-Crouse Funeral Home (Burhans-Crouse) petitions this Court for review of the Pennsylvania Public Utility Commission's (Commission) April 4, 2024 Final Order (Final Order) denying Burhans-Crouse's Exceptions to the Administrative Law Judge's (ALJ) Initial Decision (Decision) that granted Columbia Gas of Pennsylvania, Inc.'s (Columbia) application to abandon natural gas service to Burhans-Crouse (Application). Burhans-Crouse presents two issues for this Court's review: (1) whether the Commission erred by applying the Management Decision Doctrine to conclude that Columbia's decision to abandon service to Burhans-Crouse is within Columbia's managerial discretion; and (2) whether the Commission properly concluded that Columbia met its burden to justify abandoning Burhans-Crouse's gas service.[1] After review, this Court affirms.

---

[1] This Court has reordered Burhans-Crouse's issues for ease of discussion.

# I. Facts

Columbia is a public utility that provides natural gas service to approximately 442,000 customers in 26 Pennsylvania counties pursuant to certificates of public convenience granted by the Commission. Burhans-Crouse operates a family-owned funeral home (Funeral Home) at 32 Connellsville Street, Dunbar Borough (Borough), Pennsylvania (Premises), currently owned and operated by Cathy Crouse (Crouse). Crouse owns the real estate upon which Burhans-Crouse is situated, as well as the structure located at 28 Connellsville Street in the Borough. The Funeral Home has operated continuously since it was founded in 1902, and is powered by natural gas, which Columbia supplies. Burhans-Crouse utilizes three natural gas meters, consisting of two commercial meters and one residential meter. In addition to the Funeral Home, the Premises includes five rental apartment spaces, one of which is currently occupied. Crouse has been renovating and remodeling the unoccupied units since August of 2021, as she has the money to do so. Crouse last rented one of the apartments in approximately 2001, and another a few years before that. Crouse intends, in the future, to install a gas-powered crematory at the Premises and plans to resume renting the unoccupied units to tenants. The Premises, situated immediately adjacent to Dunbar Creek, is in a floodplain. The Borough experienced floods in 1912, 1936, 1954, 1972, 1985, and 2014, the most recent of which caused $125,000.00 of damage to the Funeral Home.

Columbia currently serves the Borough by a low-pressure natural gas system with an extensive leakage history. In addition to the leaking bare steel pipe, the Borough's low-pressure system contains significant amounts of pre-1982 plastic pipe, which, consistent with industry practices, must be replaced due to its brittle

tendencies.[2]  The Commission has approved Columbia's Long-Term Infrastructure Improvement Plan (Improvement Plan), which prioritizes the replacement of pre-1982 plastic in its system and would bring medium pressure into the area.

Columbia provides service to the Premises from an approximate 400-foot section of low-pressure pipe comprised of mixed size piping and materials, which were installed in 1978.  The existing main line serving the Premises crosses Dunbar Creek via a bridge attachment on the downstream side, and on the southern end of the bridge crossing.  The main line intersects with a railroad-owned right-of-way before offsetting towards the Premises.  Replacing the main line that serves the Premises was initially part of Columbia's Improvement Plan.

However, on June 4, 2022, Columbia notified Crouse of its intention to discontinue service to the Premises.  Columbia had investigated several potential options to replace the main line serving the Premises but determined that the options were not viable due to safety issues, railroad policies, or cost.  According to Columbia's estimate, the most conservative viable option to replace the main line would result in a net increase to Columbia's capital investment of at least $300,000.00 at a time when it was experiencing an annual revenue deficiency of $31,668.00.

Columbia analyzed several options before seeking abandonment. Columbia first considered replacing the main line along its current location, attached to the downstream side of the bridge crossing Dunbar Creek along Connellsville Street.  Columbia determined it was unable to meet the railroad's shoring

---

[2] Columbia maintains that the upgrade of the Borough to medium pressure will accomplish several key objectives, including the installation of domestic regulators on all customer meters (that protect individual customers in the case of an unexpected system event), the elimination of water-related operational problems, and the installation of excess flow valves on customer service lines (that protect customers by restricting gas flow in the event a service line is disturbed by excavation or other causes).  According to Columbia, the flow valves cannot be installed on low-pressure systems due to minimum required pressure differentials.

requirements for excavation within the railroad's right-of-way. Columbia concluded that shifting the excavation to other locations at the southern end of the aforementioned bridge also required shoring based on their proximity to the railroad's right-of-way, and, therefore, replacement of the main line serving the Premises on the downstream side of the bridge crossing Dunbar Creek was not possible.

In addition, Columbia evaluated extending the main line replacement along Woodvale Street (which is perpendicular to Connellsville Street) to the Premises. Columbia concluded that doing so was not a viable option because such approach would require attaching the main line to the Woodvale Street bridge, which was not practical due to the bridge's quality and structure. Further, this approach would require Columbia to bore under railroad tracks, which it determined was impractical due to the boring site's location at a busy intersection. Given the distance and costs required to transport the gas from Woodvale Street, Columbia determined that this was not a viable option.

Columbia also considered installing the main line on the upstream side of the Dunbar Creek bridge but determined that doing so would introduce significant risk to the main line because it is a known, potentially hazardous area that could impact Columbia's long-term main line operation. Columbia therefore concluded that installing the main line on the upstream side of the Dunbar Creek bridge was not a viable option.

Columbia further investigated the option of installing the main line along Short Street under Dunbar Creek to Connellsville Street and then to the Premises (Open-Cut Option). According to Columbia, implementing the Open-Cut Option would cost approximately $300,000.00. The estimated incremental investment to implement the Open-Cut Option would result in a revenue deficiency

for Columbia, utilizing the cost of capital, income taxes, and depreciation approved in Columbia's 2021 base rate case, of approximately $31,668.00 per year.

On October 28, 2022, Columbia filed the Application with the Commission. Therein, Columbia proposed to: (1) discontinue use; (2) discontinue operation of the transmission main; and (3) abandon service to all properties connected to the transmission main, including Burhans-Crouse. On November 23, 2022, Burhans-Crouse filed a Protest to the Application seeking for the Commission to deny the Application. On April 26, 2022, the Commission convened a telephonic evidentiary hearing at which Columbia presented testimony from two witnesses and offered nine exhibits that the Commission admitted into the record. Burhans-Crouse offered six exhibits that the Commission admitted into the record.

On August 11, 2023, ALJ Jeffrey A. Watson (ALJ Watson) issued his Decision granting Columbia's Application. On August 29, 2023, Burhans-Crouse filed Exceptions to ALJ Watson's Decision. On September 8, 2023, Columbia filed Reply Exceptions. On September 15, 2023, Burhans-Crouse filed a Response to Columbia's Reply Exceptions. On September 22, 2023, Columbia filed a letter requesting that Burhans-Crouse's Response to Columbia's Reply Exceptions be stricken and removed from the docket. On September 25, 2023, Burhans-Crouse filed a letter response to Columbia's letter in which Burhans-Crouse requested that the Commission strike Columbia's Reply Exceptions.

On April 4, 2024, the Commission issued its Final Order denying Burhans-Crouse's Exceptions, adopting ALJ Watson's Decision, and approving Columbia's Application subject to conditions, including Columbia's payment of

5

$20,635.23 to Burhans-Crouse to defray the cost of converting from natural gas to an alternate fuel source. Burhans-Crouse appealed to this Court.[3]

## II. Discussion

### A.        Management Decision Doctrine

Burhans-Crouse argues that the Commission erred by applying the Management Decision Doctrine[4] to conclude that Columbia's decision to abandon service to Burhans-Crouse is within Columbia's managerial discretion. However, Burhans-Crouse's characterization of the Commission's actions with respect to the Management Decision Doctrine is inaccurate. The Commission did not hold that Columbia's decision to abandon service was within its managerial discretion but, rather, that Columbia acted within its managerial discretion in selecting and evaluating potential replacement options. Specifically, the Commission observed:

---

[3]        This Court's review of a [Commission] adjudication determines "whether constitutional rights have been violated, an error of law has been committed, or the Commission's findings and conclusions are, or are not, supported by substantial evidence." *Barasch v. [Pa.] Pub[.] Util[.] Comm['n]*, . . . 493 A.2d 653, 655 ([Pa.] 1985). As to questions of law, this Court's scope of review is plenary, and its standard of review is *de novo*. *See Popowsky v. [Pa.] Pub[.] Util[.] Comm['n]*, 910 A.2d 38 . . . ([Pa.] 2006).

*Twin Lake Utils., Inc. v. Pa. Pub. Util. Comm'n*, 281 A.3d 384, 389 n.5 (Pa. Cmwlth. 2022). Following its appeal to this Court, Burhans-Crouse filed several stay applications with the Court which were discussed and addressed in this Court's December 12, 2024 Memorandum Opinion and Order. Accordingly, those applications will not be addressed herein.

[4] "As explained by the Pennsylvania Supreme Court[,] under the [M]anagement [D]ecision [D]octrine[,] 'it is not within the province of the Commission to interfere with the management of a utility unless an abuse of discretion or arbitrary action by the utility has been shown.'" *Pickford v. Pub. Util. Comm'n*, 4 A.3d 707, 715 (Pa. Cmwlth. 2010) (quoting *Pa. Pub. Util. Comm'n v. Phila. Elec. Co.*, 561 A.2d 1224, 1226-27 (Pa. 1989)).

6

> ALJ Watson reasoned . . . that although the **method in which pipe will be replaced** is within Columbia's managerial discretion, Columbia cannot act arbitrarily or abuse its managerial discretion. He further reasoned that Columbia's decision will be evaluated pursuant to the [relevant factors] and that [sic] they are not in conflict with the [M]anage[ment] [D]ecision [D]octrine.

Burhans-Crouse Br., App. A, Comm'n Final Order at 10 (emphasis added; citation omitted).

> Notwithstanding, Burhans-Crouse asserts:

> Columbia . . . has **not** exercised discretion as to the method of gas line replacement, choosing one line replacement option over another; rather, Columbia has simply made the decision to abandon service to Burhans-Crouse, a decision that is not within Columbia's discretion but is strictly governed by the Public Utility Code, 66 Pa.C.S. § [101-3316 (Code),] and [the Commission's R]egulations . . . .

Burhans-Crouse Br. at 39-40.

Accepting Burhans-Crouse's assertion, the law would preclude any utility from seeking to abandon service, since a utility would be required to select an *acceptable* replacement method even where abandonment is in the public interest. Such is not the law. Here, Columbia, in its managerial discretion, investigated and evaluated possible methods to replace the main line to the Premises. After determining that none of the options were in the public interest, Columbia approached the Commission requesting permission to abandon service, as the Code provides. The Commission reviewed the evidence presented with respect to each option, and, thereafter, **the Commission concluded that none were in the public interest**. Accordingly, Burhans-Crouse's argument fails.

7

## B. **Burden of Proof**

Burhans-Crouse next contends that the Commission erred by concluding that Columbia met the necessary burden of proof to abandon natural gas service to Burhans-Crouse. Specifically, Burhans-Crouse contends that the Commission erred by failing to consider and/or erroneously applied the factors considered for abandonment and further erred by rendering a decision unsupported by substantial evidence.

This Court in *Borough of Duncannon v. Pennsylvania Public Utility Commission*, 713 A.2d 737 (Pa. Cmwlth. 1998),[5] explained:

> Section 1102(a)(2) of the . . . Code[] provides that a utility must first apply for and obtain a certificate of public convenience prior to any abandonment of utility service to the public. 66 Pa.C.S. § 1102(a)(2). Section 1103(a) of the Code defines the general standards to be applied by the Commission in determining whether to grant such a certificate of public convenience. [Section 1103(a) of the Code] states, in pertinent part, that:
>
>> A certificate of public convenience shall be granted by the Commission, only if the Commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience[,] or safety of the public. The Commission, in granting such certificate, may impose such conditions as it may deem to be just and reasonable.
>
> 66 Pa.C.S. § 1103(a)
>
> The Pennsylvania Superior Court stated that a condition which relates to the convenience of the public pursuant to Section 1123(a) [of the Code, 66 Pa.C.S. § 1123(a),] "would be one providing that substitute service be furnished." *W*[.] *Penn Rys. Co. v. P*[*a.*] *Pub*[.] *Util*[.]

---

[5] *Duncannon* involved the proposed termination of water service.

*Comm*['*n*], . . . 15 A.2d 539, 544 ([Pa. Super.] 1940).[6] The court in *West Penn* also noted that those who receive the service are to receive consideration when determining whether to allow abandonment. The Pennsylvania Superior Court listed the following factors to be considered when determining the necessity to abandon service: [(]1) the extent of loss to the utility; [(]2) the prospect of the system being used in the future; [(]3) the loss to the utility balanced with the convenience and hardship to the public upon discontinuance of such service; and [(]4) the availability and adequacy of the service to be substituted [(*West Penn* factors/*Duncannon* factors).] *Commuter*[*s'*] *Comm*[.] *v. P*[*a.*] *Pub*[.] *Util*[.] *Comm*['*n*], . . . 88 A.2d 420 ([Pa. Super.] 1952).

The Superior Court found that the Commission must weigh these factors and not focus on mere cost-benefit criteria. Unless the proposed abandonment favorably survives evaluation under the *West Penn* factors[,] the Commission has the authority to deny a utility's request to abandon service. *Warwick Water Works, Inc. v. P*[*a.*] *Pub*[.] *Util*[.] *Comm*['*n*], 699 A.2d 770 (Pa. Cmwlth. 1997). Therefore, the Commission has the authority to grant, deny, or even condition an abandonment request. Anything less would improperly limit the Commission's ability to protect utility customers and expose the public to the whims of a utility seeking to cease utility service for purely financial reasons.

*Duncannon*, 713 A.2d at 739-40 (citations omitted).

When considering gas service abandonment, the Commission also applies the additional factors identified in *Re Victor Gas Co.*, 49 Pa.P.U.C. 649 (Order entered Jan. 27, 1976),[7] wherein the Commission explained:

---

[6] *West Penn* involved the proposed abandonment of railroad operations.

[7] Here, in its Final Order, the Commission observed:

In determining if a proposed abandonment is in the public interest, the Commission has not set forth a strict standard of review, but rather has followed the various considerations examined in numerous prior decisions addressing public utilities' abandonment of service and evaluated the record before us with those

> Where . . . the Commission is confronted by the possible abandonment of service by a gas utility . . . variation from the 4-part [*West Penn*] test announced . . . is necessary in order to evaluate properly the potential abandonment. Among the factors to be considered in determining the propriety of abandonment of service by a gas distribution utility are the following: (1) availability of supply; (2) economics of maintaining the system; (3) number of customers affected; (4) availability of alternate fuels; (5) costs of conversion and the allocation of such costs[;] and (6) any miscellaneous considerations.

*Id*. at 653-54.

> With respect to the burden of satisfying the aforementioned factors,

> Section 332(a) of the Code provides that "the proponent of a rule or order has the burden of proof." 66 Pa.C.S. § 332(a). Thus, as the moving party here, [Columbia] bore the burden of proving, by a preponderance of the evidence, that it is entitled to [the requested relief]. The preponderance of the evidence is a more likely than not standard. Further, the burden of proof is comprised of two, distinct burdens: the burden of production and the burden of persuasion. The burden of persuasion never leaves the proponent of the order, but the burden of production may shift during the proceedings. If the proponent of the order makes out its prima facie case, the burden shifts to the opposing party to present evidence that balances the evidence presented, and, if it does so, the moving party has not met its burden and must provide additional evidence to support the claim.

*Borough of Middletown v. Pa. Pub. Util. Comm'n*, 301 A.3d 965, 974-75 (Pa. Cmwlth. 2023) (citations omitted); *see also Warwick*.

---

> considerations in mind. *See Appl*[.] *of Laurel Pipe Line Co*[.]*, L.P. for Approval to Change Direction of Petroleum Prods. Transp*[.] *Serv*[.] *to Delivery Points W*[.] *of Eldorado, P*[a.], Docket No. A-2016-2575829 ([Pa. Pub. Util. Comm'n, Order filed] July 12, 2018).

Burhans-Crouse Br., App. A, Comm'n Final Order at 7.

Burhans-Crouse asserts that the Commission misapplied the *West Penn* factors with respect to Columbia's burden of proof and that the Commission's factual findings related thereto were not supported by substantial evidence.

### 1. *West Penn* and *Victor Gas* Factors

#### a. Commission's Application of the *West Penn* Factors

##### (1) The Extent of Loss to the Utility

Regarding the first *West Penn* factor - "the extent of loss to the utility"[8] - the "test is whether the loss to the carrier is unreasonable under all the circumstances, having regard to the interests of the public as well as the utility." *Commuters' Comm.*, 88 A.2d at 424. Further, apart from demonstrating the extent of the loss, Commission precedent also requires the public utility to demonstrate that the losses cannot be cured by a reasonable rate increase. *See Appl. of Laurel Pipe Line Co., L.P. for Approval to Change Direction of Petroleum Prods. Transp. Serv. to Delivery Points W. of Eldorado, Pa.*, Docket Nos. A-2016-2575829; G-2017-2587567 (Pa. Pub. Util. Comm'n, Order filed July 12, 2018).

> Addressing the first *West Penn* factor, the Commission observed:
>
> [ALJ Watson] prefaced his evaluation of this factor by noting Columbia's two[-]pronged argument: (1) that public utilities are entitled to the return of capital expenditures made for the convenience of the public as well as the opportunity to earn a return on such expenditures; and (2) that expenditures by public utilities, which shall be recovered in rates, must be reasonably and prudently incurred. . . .
>
> In evaluating this factor, ALJ Watson determined that Columbia had evaluated several options for replacing the

---

[8] *Duncannon*, 713 A.2d at 740. In describing the *West Penn* test, the *Duncannon* Court cited *Commuters' Committee*, which further clarified the first *West Penn* factor as "[t]he extent of the carrier's loss on the particular branch or portion of the service, and the relation of that loss to the carrier's operation as a whole[.]" *Commuters' Comm.*, 88 A.2d at 424.

11

main line servicing Burhans-Crouse and that four (4) options were investigated in depth. The preferred [Open-Cut O]ption to replace the main line would cost Columbia approximately $300,000[.00,] translating to an annual cost of approximately $35,567[.00]. For this option to be economically justified, Burhans-Crouse would have to provide this amount in annual non-gas distribution revenues. [ALJ Watson] noted that at the current Columbia rates, Burhans-Crouse's projected annual non-gas revenue would be $3,899[.00] or an annual revenue deficiency of $31,668[.00]. In reviewing the options presented by Columbia, [ALJ Watson] found that Columbia did not abuse its managerial discretion or act arbitrarily in its task to discover a viable option to replace the main line in dispute.

Burhans-Crouse Br., App. A, Comm'n Final Order at 11-12 (citations and footnote omitted).

The Commission further noted:

Additionally, ALJ Watson turned to whether Columbia must prove that any alleged service deficiencies could not be cured by a reasonable rate increase as Burhans-Crouse claimed. [] ALJ [Watson] noted that Columbia relied upon the Code and its requirement that costs must be reasonable and prudent to be eligible for recovery in base rates. ALJ Watson determined that it would not be prudent to require Columbia's other customers to subsidize the replacement of the main line serving Burhans-Crouse through a rate increase. ALJ Watson rejected Burhans-Crouse's argument that relies on . . . cases which involved a water source for which there is no alternative unlike the case at hand as a proposed abandonment of natural gas service that does have alternate energy sources available. He further explained that the case[ ]law cited by Burhans-Crouse does not support its position that an applicant must prove that any alleged deficiencies could not be cured by a rate increase under the existing circumstances. ALJ Watson's determination was based upon the fact that the cases cited by Burhans-Crouse involved water sources without any alternative, unlike the present case where there are alternative energy sources to natural gas service.

12

Burhans-Crouse Br., App. A, Comm'n Final Order at 12-13 (citations and footnote omitted).

> The Commission concluded:
>
> We find that Columbia met its burden of proof by showing that its losses could not be cured by the granting of a reasonable rate increase. Here, Columbia articulated that its rates must be just, reasonable[,] and prudently incurred in order to be eligible for recovery under the Code. The cost to replace the main line at approximately $300,000[.00] to serve one customer vastly outweighs the revenue [Columbia] expects to be collected from that customer resulting in a deficiency other Columbia customers would be expected to subsidize which is unreasonable. Furthermore, Columbia articulated that replacement would not enhance the system and only be incurred to serve one customer which indicates that the expense to replace would not be prudently incurred and may be ineligible for recovery.

Burhans-Crouse Br., App. A, Comm'n Final Order at 29 (citations omitted).

### (2) The Prospect of the System Being Used in the Future

Regarding the second *West Penn* factor - the prospect of the subject pipeline being used in the future - the Commission observed:

> ALJ Watson stated that the prospect of future use should be considered when determining the necessity to abandon service. [] ALJ [Watson] explained that the appropriate inquiry regarding future development is related to the portion of the main line at issue because of its effect on the revenue deficiency calculations and its effect on circumstances in this matter. For this point of consideration, [] ALJ [Watson] stated that it was Burhans-Crouse's intention to renovate and lease four apartments and add a crematory to its [P]remises which would add gas usage to the main line at issue. However, ALJ Watson found that Columbia had established that there was no opportunity for growth in the area that could lead to adequate additional customers to significantly reduce or

13

eliminate the revenue deficiency generated by the replacement of the main line.

Here, [] ALJ [Watson] reasoned that the evidence established that even if all four apartments were occupied and served by Columbia, the revenue deficiency would decrease to $27,191[.00]. Additionally, Burhans-Crouse did not submit any evidence of any actions taken to move forward with the installation of a crematory, and if it was to be installed, that it would result in additional natural gas usage. Based on the speculative nature and absence of the evidence presented, ALJ Watson concluded that this factor weighs in favor of abandonment.

Burhans-Crouse Br., App. A, Comm'n Final Order at 13-14 (citations omitted).

### (3) The Loss to the Utility Balanced with the Convenience and Hardship to the Public Upon Discontinuance of Such Service

Concerning the third *West Penn* factor - the loss to the utility balanced with the convenience and hardship to the public upon discontinuance of the service - the Commission stated:

ALJ [Watson] considered the loss to Columbia balanced with the convenience or hardship to the public of discontinuance of service. Here, ALJ Watson pointed out that Columbia seeks to abandon 400 feet of main line serving only one customer, Burhans-Crouse, to avoid incurring costs that would not be reasonable or prudent. The [] Decision explained that if Columbia was to abandon the main line serving Burhans-Crouse, then Burhans-Crouse's energy costs would likely increase potentially causing the funeral home to close. In weighing the arguments and evidence presented, ALJ Watson reasoned that Columbia's financial loss to continue service to one customer outweighs Burhans-Crouse's inconvenience and the hardship to the public.

In support of his decision, ALJ Watson cited to several cases where the Commission found in favor of the applicant to abandon service when there is an annual revenue deficiency of at least $21,000[.00]. [] ALJ [Watson] stated that the main line is serving one customer

14

and costs approximately $300,000[.00] to replace resulting in an annual revenue deficiency of approximately $31,668[.00]. Ultimately, ALJ Watson determined that the cost of replacement of the line is not justified by the annual distribution revenue generated by Burhans-Crouse.

Burhans-Crouse Br., App. A, Comm'n Final Order at 12-13 (citations and footnote omitted).

### (4) The Availability and Adequacy of the Service to be Substituted

With respect to the fourth *West Penn* factor - the availability and adequacy of the service to be substituted - the Commission recounted:

> The fourth factor considered by the ALJ is the availability and adequacy of the service to be substituted. Here, the evidence established that Burhans-Crouse has both electricity and propane available as alternate energy sources. ALJ Watson noted that Burhans-Crouse was able to obtain estimates for conversion to electricity which demonstrates that such conversion is not unreasonable. [] ALJ [Watson] also noted that conversion to propane is possible. Although [] ALJ [Watson] found that Burhans-Crouse's parking lot would be impacted by propane tanks, [] ALJ [Watson] determined propane to be a reasonable alternative. ALJ Watson concluded that the record evidence demonstrated that there are alternate energy sources available to Burhans-Crouse and both electricity and propane would be adequate alternates.

Burhans-Crouse Br., App. A, Comm'n Final Order at 14 (citations omitted).

Having reviewed ALJ Watson's application of the *West Penn* factors to this case, the Commission concluded:

> We find that the record is clear that Columbia met its burden of proving that its Application . . . is in the public interest. [] ALJ [Watson] appropriately considered and weighed the evidence presented to conclude that the factors of *Duncannon* weighed in favor of granting Columbia's Application. First, the record represents that there would be significant loss to Columbia because the

15

main line serving only Burhans-Crouse was not necessary to otherwise enhance [Columbia's] system or serve other customers.[9] Second, the record is absent of evidence demonstrating that Columbia's [] prospect of the system being used in the future would negate the revenue deficiency caused by replacement. Third, the evidence presented illustrates that Columbia's financial loss to continue service to one customer outweighs Burhans-Crouse['s] inconvenience and the hardship to the public. Lastly, the record reflects that both electricity and propane are available alternate energy sources for Burhans-Crouse. While we recognize that either alternate energy source poses potential challenges, the challenges are not insurmountable.[10]

---

[9] Notably, in *Duncannon*, this Court affirmed the Commission's approval of the utility's abandonment request where "[t]he Commission determined that the expense of bringing the [portion of the service] into compliance with [] surface water regulations was substantial in light of the fact that the upgrades **would only benefit seven customers**." *Duncannon*, 713 A.2d at 740 (emphasis added).

[10] Commission Chairman Stephen M. DeFrank (Chairman DeFrank) also issued a statement wherein he observed:

> Columbia [] investigated four potential options to replace the main, and the options were determined by Columbia [] not to be viable due to safety issues, railroad policies, or cost. The option preferred by Columbia [] is one that lacks the safety and operational concerns of the alternatives and involves installing a new main along Short Street, under the Dunbar Creek to Connellsville Street, and then to the [F]uneral [H]ome. It is estimated that replacement costs for this option would be approximately $300,000[.00] and would result in an annual net revenue deficiency of $31,668[.00], without prospects of future use for the main that would overcome a revenue deficiency.

> Conversion to alternative fuel sources, such as electricity and propane, are possible[,] albeit complex and/or expensive. The [F]uneral [H]ome is located in a floodplain which would necessitate the construction of a platform or enclosure to house a propane tank. The estimates the [F]uneral [H]omeowner received for converting to electric service are costly, with some exceeding $100,000[.00]. Heating costs for the [F]uneral [H]ome will likely increase with a conversion to either propane or electricity when compared to prices for natural gas heating.

Burhans-Crouse Br., App. A, Comm'n Final Order at 28.

### b. Commission's Application of the *Victor Gas* Factors

Concerning the *Victor Gas* factors, the Commission observed:

ALJ Watson discussed the [] *Victor Gas* standard utilized by the Commonwealth Courts when considering abandonment of service and that the Commission has required additional consideration when contemplating abandonment of gas service. He listed the six (6) factors . . . : (1) availability of supply; (2) the economics of maintaining the system; (3) the number of customers affected; (4) the availability of alternative fuels and/or suppliers; (5) the costs of converting to alternative fuels or suppliers and the allocation of such costs; and (6) any other miscellaneous factors.

ALJ Watson explained that availability of supply is not at issue in this case and that the issues are related to the economics of maintaining the system and addressed by the factors in *Duncannon*. He further mentioned that the number of customers affected was one commercial premises owned by Burhans-Crouse consisting of two commercial meters and one residential meter. [] ALJ [Watson] reasoned that it was not likely that additional development would occur in the area.

---

As a Fayette County native, I am familiar with this area and empathize with the challenges facing businesses in a struggling economy. I am cognizant of the difficult circumstances that this [F]uneral [H]ome faces related to the abandonment of gas service. However, ultimately, I agree that Columbia has handled this situation reasonably and in a manner consistent with its tariff. The cost of the replacement of this main is considerably uneconomic, as exhibited by the net annual revenue deficiency. It would be unreasonable for Columbia [], and therefore its ratepayers, to incur such uneconomic costs when alternative fuel sources are available to the [F]uneral [H]ome. Challenging circumstances like this are often at the center of Commission proceedings. Nonetheless, we must stay guided by our goal to achieve the overall public interest. To that end, I support approval of the [A]pplication.

Burhans-Crouse Br. App. A, Statement of Chairman DeFrank.

17

Burhans-Crouse Br., App. A, Comm'n Final Order at 15 (citations omitted).

Burhans-Crouse contends that the Commission failed to hold Columbia to its evidentiary burden by misapplying the *West Penn* factors. Specifically, Burhans-Crouse asks this Court to reexamine the service options that Columbia considered, evaluate their efficacy, and conclude that the Commission erred by holding that the relevant facts adequately supported Columbia's Application.

"Because the Commission is the ultimate fact[-]finder and arbiter of credibility and evidentiary weight, Section 335(a) of the Code, 66 Pa.C.S. § 335(a), [this Court is] bound by the Commission's determination of those matters[.]" *Metro. Edison Co. v. Pa. Pub. Util. Comm'n*, 22 A.3d 353, 364 (Pa. Cmwlth. 2011). It was for the Commission to weigh the evidence and determine whether Columbia satisfied the service abandonment factors.

> [This Court] may not substitute [its] judgment for that of [Commission] "when substantial evidence supports the [Commission]'s decision on a matter within the [C]ommission's expertise." [*Coal. for Affordable Util. Servs. & Energy Efficiency in Pa. v. Pa. Pub. Util. Comm'n*, 120 A.3d 1087 (Pa. Cmwlth. 2015)] (internal quotation marks and citation omitted). "Judicial deference is even more necessary when the statutory scheme is technically complex." *Id.* (internal quotation marks and citation omitted).

*Retail Energy Supply Ass'n v. Pa. Pub. Util. Comm'n*, 185 A.3d 1206, 1220 (Pa. Cmwlth. 2018). Based on the Commission's discussion of the relevant factors, this Court concludes that it did not misapply the *West Penn* and *Victor Gas* factors, and Burhans-Crouse's argument is without merit. Nonetheless, substantial evidence must support the Commission's Final Order.

## 2. Substantial Evidence Supporting the Commission's Factual Findings

Although Burhans-Crouse raised numerous exceptions to ALJ Watson's factual findings, in its brief to this Court, Burhans-Crouse focuses on the Commission's rejection of its Exceptions to ALJ Watson's Finding of Fact (FOF) 26. Burhans-Crouse states: "[The] Commission made several findings regarding the safety, cost[,] and viability of the option of attaching to the downstream side of the [Dunbar Creek] bridge . . . which are not supported by [substantial] evidence." Burhans-Crouse Br. at 33. FOF 26 states: "Replacing the main line along its current location, attached to the downstream side of the bridge crossing Dunbar Creek along Connellsville Street, is not a viable option [a]s Columbia determined it was unable to meet the railroad's shoring requirements related to excavation within the railroad's right-of-way." Certified Record (C.R.) at 748a.

With respect to that option, Columbia's field engineer Garrett Henry (Henry) testified:

> Columbia investigated replacing the main line along its current location. As it currently exists, the main line is attached to the downstream side of the bridge crossing Dunbar Creek along Connellsville Street. In preparing designs for this route, it was determined that a section of the existing main line was in a railroad right-of-way situated at the southern end of the aforementioned bridge. . . . Columbia attempted to coordinate with the railroad operator on design requirements for working in the railroad's right-of-way, but it was determined that Columbia was unable to meet the railroad's shoring requirements related to excavation within the railroad's right-of-way.
>
> Columbia investigated options that could avoid invoking the railroad's shoring requirements. For instance, Columbia investigated shifting the location of the excavation to other locations at the southern end of the aforementioned bridge. However, each of the other locations investigated also required shoring based on their proximity to the railroad's right-of-way. Columbia

19

ultimately determined through the design process and on-site field discussion that shoring is not possible because of numerous conflicts/obstacles, including a utility pole, a railroad crossing pole, and guide rails. Further . . . there is a "no excavation zone" within fifteen (15) feet of the centerline of the railroad's tracks. This prohibition, along with Columbia's inability to install shoring at the specific excavation location, render replacement of the main line serving the Premises on the downstream side of the bridge crossing Dunbar Creek not possible.

C.R. at 595a-596a (citations omitted).

Notwithstanding, Burhans-Crouse emphasizes that Henry's testimony on cross-examination "does [not] support the Commission's finding of Columbia's 'inability to meet shoring requirements.'" Burhans-Crouse Br. at 34 (quoting Comm'n Final Order at 28). Burhans-Crouse points to the following exchange between its counsel and Henry:

A. Through our conversations with [the railroad], they've indicated requirements that prevent us from being able to continue service to the [F]uneral [H]ome.

Q. Are you saying that it would be impossible for Columbia to meet those requirements?

A. In terms of working with the railroad affected route, Columbia is not willing to take on any impacts that require the railroad acts - or the railroad requests to go that route.

Q. But [the railroad] has not refused to cooperate with Columbia regarding any potential replacement.

Correct?

A. That's correct.

Q. The concern with working with [the railroad] and involving the railroad right-of-way would be, in part, shoring requirements.

Correct?

A. Can you repeat the question, please?

20

Q. The concern that Columbia has you would have in your engineering team with working with the railroad and in the railroad right-of-way would concern, in part, shoring requirements. Is that correct? Is that fair?

A. Yes, that's correct.

Q. Isn't it standard in engineering practice to drill test borings to determine what kind of shoring is necessary or appropriate?

A. I'm not aware of that.

Q. Test borings were not performed in Columbia's investigation of any option to replace the line.

Is that correct?

A. That's correct.

Reproduced Record (R.R.)[11] at 71a-72a.

Burhans-Crouse also emphasizes that its expert, Joseph Boward (Boward), testified that the referenced shoring did not appear to be unusual and that his testimony does not support Columbia's contention or the Commission's finding of Columbia's inability to meet the shoring requirements. Based on Henry's testimony on cross-examination and Boward's opinion, Burhans-Crouse characterizes Columbia's position as arbitrary or simply that Columbia is *unwilling* to meet the shoring requirements.

Contrary to Burhans-Crouse's assertions, nothing in Henry's testimony on cross-examination undermines his testimony on direct examination which would authorize this Court to intrude on the province of the fact-finder. Further, with respect to Boward's expert testimony, "the weight to be given to [expert] testimony is for the trier of fact to determine." *Tucker v. Bensalem Twp. Sch. Dist.*, 987 A.2d 198, 204 n.5 (Pa. Cmwlth. 2009) (quoting *Miller v. Brass Rail Tavern, Inc.*, 664

---

[11] This Court cites to both the Certified Record and Reproduced Record because the Reproduced Record does not contain all of the relevant documents.

21

A.2d 525, 528 (Pa. 1995)). The Commission was empowered to consider Henry's and Boward's testimony and assign the testimony the weight the Commission believed each deserved. This Court may not intrude upon the Commission's fact-finding authority. Based upon Henry's testimony, this Court concludes that FOF 26 is supported by substantial evidence.[12]

Finally, Burhans-Crouse argues that substantial evidence does not support the Commission's FOF 39 that "Burhans[-Crouse] has both electricity and

---

[12] With respect to FOF 26, Burhans-Crouse also argues that the Commission erroneously attributed an approximate $300,000.00 cost to that replacement option. The Commission stated:

> We find that the record reflects that Columbia investigated the Dunbar Creek replacement option in good faith. Columbia, in an effort to explore the replacement of the main to the downstream side of Dunbar Creek, filed an Application for Approval of the Alteration of Crossing with the Commission . . . . During a meeting between Columbia and the railroad company, . . . Columbia determined that it could not guarantee that the integrity of the railroad tracks would not be compromised. **Even assuming** that Columbia could meet the shoring requirements of the railroad company, Burhans-Crouse ignores the fact that this replacement option would cost approximately $300,000[.00], almost [10] times the amount of the maximum justifiable replacement cost to serve Burhans-Crouse. We find that Columbia's rejection of this replacement option is reasonable based upon the safety concerns and the cost associated with replacement.

Burhans-Crouse Br., App. A, Comm'n Final Order at 20 (citations omitted; emphasis added). It appears that the Commission incorrectly attributed the estimated cost of Columbia's preferred Open-Cut Option to the option providing for the replacement of the main to the downstream side of Dunbar Creek. *See* C.R. at 599a, 748a.

Notably, FOF 26 does not address the cost of the option but simply states: "Replacing the main line along its current location, attached to the downstream side of the bridge crossing Dunbar Creek along Connellsville Street, is **not a viable option as Columbia determined it was unable to meet the railroad's shoring requirements** related to excavation within the railroad's right-of-way." C.R. at 748a (emphasis added). Further, the Commission accepted that Columbia could not guarantee that the integrity of the railroad tracks would not be compromised, and that those safety concerns rendered that option nonviable. Thus, the Commission's error is harmless. *See Commonwealth v. Allshouse*, 36 A.3d 163 (Pa. 2012).

22

propane available as alternate energy sources." C.R. at 749a. Initially, it was Columbia's "burden to show available alternative sources of supply." *Warwick*, 699 A.2d at 775. Although Columbia did not show such alternative sources, the Commission observed:

> [T]he record reflects evidence of both electricity and propane as potential alternate energy sources for Burhans-Crouse. In the direct testimony of [] Crouse, she explains that estimates for both propane and electric conversions were obtained. [*See* R.R. at 109a-111a]. While [] Crouse's testimony describes some issues involved with either electric or propane conversion, the issues do not appear to be impossible to overcome. Furthermore, the electric conversion estimate includes the four apartments that are not currently receiving natural gas service from Columbia and adds to the conversion costs. We conclude that the record reflects that both electric and propane are available alternate energy sources for Burhans-Crouse.

Burhans-Crouse Br., App. A, Comm'n Final Order at 24.

Contrary to the Commission's conclusion, Crouse's direct testimony does not include that she obtained estimates for propane conversion. Rather, Crouse presented the following testimony:

> **Q. Have you attempted to obtain estimates of the cost to convert the Burhans-Crouse building to propane power?**
>
> A. Yes[.]
>
> **Q. Who have you contacted for propane estimates and what were their responses?**
>
> A. <u>Several don't service Dunbar</u> area like Ferrell Gas <u>or won't put a tank in a flood plain</u>. Luther Miller - no; Duncan Gas - no to tank in flood zone (Brian from Duncan Gas said "that could be dangerous. So no to putting tank there[.]"); Oliver Gas - no in flood zone; Gnagey - no.

R.R. at 110a (underline emphasis added). Nowhere in Crouse's testimony does she describe receiving an estimate to convert to propane. Instead, Crouse's testimony

23

reflects that numerous providers **refused to consider** the conversion. Although Henry testified that there was no prohibition against placing a propane tank in a floodplain, Columbia did not provide any evidence showing that Burhans-Crouse could actually convert to propane.[13] For these reasons, this Court holds that substantial evidence does **not** support the Commission's finding that propane was an available alternative energy source.

> With respect to electric, Crouse testified:
>
> **Q. Have you obtained estimates of the cost to convert the Burhans-Crouse building to electric power?**
>
> A. Yes.
>
> **Q. Who has provided these estimates?**
>
> A. George R. Smalley Co. for $159,800[.00], whose estimate expressly does not include removal/replacement of any ceiling grid, tile, or hard coat, permit inspection fees; patching and painting; and electric company costs for service and HVAC contractor Klingensmith Heating and Air Conditioning--$65,000[.00] (for the installation of electric furnaces and electric hot water boilers; and Miller Home Improvement for $71,192.03 for converting multiple gas appliances to electric.

R.R. at 109a. Burhans-Crouse offered the estimates and the Commission accepted them into evidence.[14] *See id*.; *see also* C.R. at 41a-50a. Burhans-Crouse's own estimates demonstrate that electric is an alternative power source. *See* C.R. at 41a-

---

[13] Further, Borough Mayor, Andy Lowry, testified that Borough Ordinance 224 (Ordinance) imposes additional specific requirements for structures that will be used for the storage of certain products, including propane, within a floodplain area and that the Ordinance requires a building permit to construct a platform or enclosure for a propane tank.

[14] Although this Court sympathizes with Burhans-Crouse regarding the conversion costs, there is no requirement that an available alternative energy source be easy or inexpensive. *See Appl. of Nat'l Fuel Gas Distrib. Corp. for Approval of the Abandonment of Nat. Gas Serv. to One (1) Nat. Gas Serv. Customer located in Conneaut Twp., Erie Cnty., Pa.*, Docket No. A-2016-2570731 (Pa. Pub. Util. Comm'n, Order filed Sept. 21, 2017).

50a. Accordingly, record evidence supports the Commission's finding that electric is an alternative power source.

Having determined that the Commission properly concluded that Columbia had met its burden of satisfying the *West Penn* and *Victor Gas* factors, and substantial evidence supports that Burhans-Crouse has at least one alternative energy source, this Court is constrained to affirm the Commission's Final Order.

For all of the above reasons, the Commission's Final Order is affirmed.

_____
ANNE E. COVEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Burhans-Crouse Funeral Home, : 
               Petitioner : 
                : 
          v. : 
                : 
Pennsylvania Public Utility : 
Commission, :   No. 500 C.D. 2024 
             Respondent : 

## O R D E R

AND NOW, this 5th day of March, 2025, the Pennsylvania Public Utility Commission's April 4, 2024 Final Order is affirmed.

_____

ANNE E. COVEY, Judge